Filed 10/6/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re G.H., a Person Coming Under the Juvenile Court Law. | |
| | G061166 |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | (Super. Ct. No. 20DP0284) |
| Plaintiff and Respondent, | O P I N I O N |
| v. | |
| A.H. et al., | |
| Defendants and Appellants. | |

Appeals from an order of the Superior Court of Orange County, Daphne G. Sykes, Judge.  Reversed and remanded with instructions.  Respondent's motion to take additional evidence denied.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant A.H.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant J.H.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　　　\*　　　　　\*

A.H. (Mother) and J.H. (Father) appeal from the juvenile court's order terminating their parental rights to their two-year-old son, G.H., at the permanent plan selection and implementation hearing held under Welfare and Institutions Code[1] section 366.26. G.H. was detained from his parents' custody two days after he was born when both he and Mother tested positive for methamphetamine. Mother and Father were homeless at the time, and had been struggling with methamphetamine abuse for approximately eight years. Father admitted he did not discourage Mother's drug use during pregnancy. The day before G.H. was detained, Mother, G.H.'s maternal great aunt, and his maternal grandmother denied Native American ancestry. Father claimed he was a "small percent" Cherokee, but he acknowledged he was not registered as a member of the tribe.

On appeal, Mother and Father contend the juvenile court erred in finding that a statutory exception to terminating the parental rights of an adoptable child did not apply. (§ 366.26, subd. (c)(1)(B)(i).)

They also contend the Orange County Social Services Agency (SSA) and the court did not meet their obligations under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related state law to investigate G.H.'s Native American background. As we have explained in prior cases, those obligations are not primarily for the parents' sake, but instead implement federal and state public policy protecting "the broad interest of Native American tribes in maintaining cultural

---

[1]　　　　All further undesignated statutory references are to this code.

2

connections with children of Native American ancestry." (*In re A.R.* (2022) 77 Cal.App.5th 197, 201 (*A.R.*).)

Father informed the court and SSA he had contacted his mother on the social media platform, LinkedIn. As we explain, because nothing in the record suggests SSA or the court made any effort to take advantage of that contact method for the paternal grandmother, we conditionally reverse and remand for the agency and the court to do so.

## FACTUAL AND PROCEDURAL BACKGROUND

We limit our summary here to the factual and procedural history relevant to ICWA issue and related state law. We discuss the background pertinent to the benefit exception, on which the parents raise purely legal issues, in our discussion of those issues below.

At the detention hearing, the juvenile court asked Father about his "representation . . . to the social worker about Cherokee heritage." Father explained that "[t]here was a word-of-mouth understanding in the maternal side of my family that there is . . . a very, very, very small amount, but there's no registry. I don't have any details about it . . . ." Father initially represented that "none of my ancestral members are even alive on that side of my family to provide any further information," but then he mentioned his mother.

When the court asked, "And your maternal relatives are all deceased," Father answered, "Well, my mother is still alive, but my mother has not been a part of my life since age two . . . ." Father told the court his mother lived in "Tampa, I believe, but I'm not sure." He gave the court two last names for his mother, and when asked for an address, Father said, "I think I can probably get one." He added, however, that "there's no contact so I'm not really sure."

The court followed up: "Who would you get it from?" Father responded he "ha[d] some information from an attempt that I made a few years back to try to contact her. I would just have to dig it up." Father added that he had in fact contacted his mother using social media: "Last time I attempted to contact her, I did reach her via [a] LinkedIn message. It led to a phone call, that then led to no return, and *terminated any motivation for me to want a relationship*." (Italics added.) Father gave the court the last name he "believe[d]" was the one under which he had reached his mother on the social media platform.

The court recognized that, "[i]n light of that information, even though the chances are slim, the law is very clear that we have to do an investigation . . . ." The court ruled that "the I.C.W.A. issue will remain viable" and "direct[ed] the agency to follow up to see if there is a possibility of reaching [Father's mother] to clarify and verify that information that the I.C.W.A. heritage is so minute that it would not apply to this case." Counsel for SSA acknowledged, "Thank you, Your Honor."

It appears that later that same day, according to a report SSA subsequently prepared for the ensuing jurisdiction and disposition hearing, Father "was unable to provide contact information for the paternal grandmother or any other relative for further information." Two weeks later, on a social worker's "follow up call," Father "stated there is Catawba Indian heritage in the family of origin but [he] did not know of any relatives registered with the Tribes."

The social worker wrote in the report that Father "was unable to provide contact information for relatives with further information" and added, "SSA has spoken to available family member [*sic*] in regards to ICWA. SSA has been provided with all information that the family was able or willing to provide at this time."

Two months later, at the June 2020 jurisdiction hearing, the court found pursuant to Father's and Mother's stipulation that "the Indian Child Welfare Act (ICWA) does not apply."

4

After more than 18 months of ensuing reunification services, a different judge conducted the hearing under section 366.26 (.26 hearing). The court opened the hearing observing, "To begin with, has the ICWA issue been resolved—I don't think it has—with respect to these parties?" Counsel for SSA responded, "Your Honor, I believe that there was a ruling that ICWA did not apply as of March 6th of 2020," which was the date of the original detention hearing. The court made reference to a document or documents submitted by "both parents" (presumably their stipulation for the jurisdiction hearing that ICWA did not apply), and proceeded to conduct the .26 hearing. At the close of the hearing, the court found the issues that necessitated the dependency had not been resolved, G.H. could not be safely returned to the parents, he was likely to be adopted, and terminated Father's and Mother's parental rights. They now appeal.

## DISCUSSION

1. *Benefit Exception*

Father contends a statutory parent-child benefit exception precluded terminating his and Mother's parental rights. He argues the exception applied because "the record shows that the parents were loving and attentive during the[ir] visits, that the minor called appellant dada, and that the minor had difficulty separating from appellant at the end of the visits . . . ." Mother joins Father's arguments. We find no error.

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The purpose of the hearing is "to select . . . a permanent plan for the child." (*Ibid.*) Section 366.26 lists permanent plans in order of preference, with adoption having the highest priority. (§ 366.26, subd. (b)(1); *In re Edward R.* (1993) 12 Cal.App.4th 116, 122.)

Section 366.26 provides that if the court finds the child is likely to be adopted, "the court shall terminate parental rights" (subd. (c)(1)) unless an exception

5

applies. One exception includes when "[t]he court finds a compelling reason for determining that termination would be detrimental [because] [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

A parent "who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 *(Angel B).*) The parent bears the burden of proving that termination of parental rights would be detrimental to the child. (*Ibid*.) Friendly or affectionate visits are not enough. (*Id.* at p. 468.)

"To overcome the preference for adoption and avoid termination of the natural parent's parental rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466, italics in original.) The benefit exception is established only if "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

There are "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, italics in original.)

A hybrid standard governs our review. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The first two elements involve factual determinations to which the substantial evidence standard of review applies. (*Id.* at pp. 639-640.) The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Against a backdrop of conflicting evidence, including a social worker's testimony that the parents' visits were not consistent, the juvenile court found that the parents kept "generally consistent" contact with G.H.

Father argues that the court erred by further finding that, though consistent, the visits were not at a "level which has strengthened the bond between . . . parent and child." The court noted it was "troubled" by the parents' "seeming[] rejection" of some visits at "alternative locations" because they were "perhaps not optimal." According to Father, this included declining visits at a fast food restaurant that did not have a play area, which Father justifies on appeal as a disagreement over "the suitability and safety" of visitation at a dining establishment without that feature.

In particular, Father says the court's alleged error was conflating the visitation prong of the benefit exception with its second prong regarding whether the relationship the parent has with the child is in fact beneficial to the child. Father faults the court for assessing the strength or "benefit" (or lack thereof) of the parents' bond with G.H. based on, at least in part, the nature and consistency of their visitation. Father contends that, in doing so, the court committed reversible error by misapplying the analytical framework governing the benefit exception. In other words, according to Father, the court applied the wrong legal standard. We disagree.

Father's attempt to draw a strict line between the prongs of the benefit exception is without merit. They naturally inform and lead into each other. Whether a parent or parents' regular *visitation and contact* (the first prong) builds a *relationship* that is *beneficial* to the child (the second prong) depends on the nature and quality of the visits. As *Autumn H.* explained, the visitation/contact requirement and the beneficial relationship requirement are related and overlap because "[t]he [benefit] exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

7

The Supreme Court in *Caden C.* described *Autumn H.* as "the seminal decision interpreting the [benefit] exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) Father does not contend as a factual matter that benefits from the parents' relationship with G.H. outweighed any benefits that might arise from adoption. Instead, Father again makes a legal argument regarding language used at the .26 hearing. He suggests the language meant the juvenile court committed legal error by requiring that Father and Mother's relationship with G.H. must rise to the level of a *parental* relationship to qualify for the benefit exception, instead of a beneficial relationship of any kind, as provided in the statute.

We are not persuaded. The fact that the court lauded Father and Mother for maintaining a parental role with G.H. despite "limited time[]" with him, "were appropriate with their child generally," and "attended to his emotional needs during their time with him, as well as his physical needs" is not evidence that the court misapplied the benefit exception. Any doubt on this score, and we have none, must be resolved under the standard of review in favor of the court's decision. There was no error.

2. *ICWA and Related State Law*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'"[2] (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) ICWA permits an Indian child's tribe to intervene "at any point" in child welfare

---

[2] Because ICWA and related California statutes use the term "Indian," we do the same for consistency, but we acknowledge other terms are preferred. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

proceedings; additionally, in appropriate circumstances, a tribal court may receive transfer of jurisdiction over the proceedings. (25 U.S.C. § 1911(b), (c).)

ICWA has had far-reaching effects, including the enactment of related state legislation. For example, the Legislature has provided that a juvenile court may order "tribal customary adoption" as the permanent plan for a dependent child (§ 366.26, subd. (b)(2)), meaning "adoption by and through the tribal custom, traditions, or law of an Indian child's tribe" (§ 366.24, subd. (a)(1)). Because section 366.26 lists permanent plans in order of preference (§ 366.26, subd. (b)), a tribal customary adoption takes statutory priority over other permanent plans such as appointment of "a relative or relatives with whom the child is currently residing as legal guardian or guardians for the child" (*id.*, subd. (b)(3)); "a nonrelative legal guardian for the child" (*id.*, subd. (b)(5)); and/or over "permanently plac[ing the child] with a fit and willing relative, subject to the periodic review of the juvenile court . . ." (*id.*, subd. (b)(6)).

In enacting ICWA, Congress found "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." (25 U.S.C. § 1901(3).) California public policy echoes this commitment to fostering "the continued existence and integrity of Indian tribes" by protecting—including in juvenile court proceedings— children "who are members . . . or are eligible for membership . . . in, an Indian tribe." (§ 224, subd. (a)(1).)

"Because ICWA defines 'Indian child' in terms of tribal membership, not race or ancestry, 'the question of membership is determined by the tribes.'" (*In re K.T.* (2022) 76 Cal.App.5th 732, 742.) "'Only the Indian tribe(s) . . . may make the determination whether the child' is an Indian child under ICWA." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 8; see *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65-66, fn. 21 [tribes are final arbiters of their membership rights].)

9

The juvenile court nevertheless must explore whether a child in a proceeding before it may be an Indian child.[3] The juvenile court's responsibility under ICWA is to assess whether it "has reason to know" an Indian child is involved in the proceedings; that standard is of course satisfied by actual knowledge that the child "is" an Indian child, but by its terms is not limited to actual knowledge. (25 U.S.C. § 1912(a).) Under a related requirement, the Legislature has articulated in slightly different language that the juvenile court must assess whether the child "may be an Indian child" or, in fact, "is" an Indian child. (§ 224.2, subd. (a).) "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).)

In California, "[s]ection 224.2 codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs]." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9.) Thus, state law "broadly imposes on social services agencies and juvenile courts (but not parents) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.' (§ 224.2, subd. (a).)" (*Benjamin M.*, supra, 70 Cal.App.5th at pp. 741-742.)

The inquiry and notice requirements mandated by ICWA and related state law ensure Indian tribes can exercise their rights in dependency proceedings promised by those laws. As this court recently observed, federal and related state law "make clear

_____

[3]     Under ICWA, "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) State law uses the same definition. (§ 224.1, subd. (a).)

10

[that] the primary parties protected under ICWA are the Native American tribes, whose right to intervene in an appropriate case will likely never be discovered absent the statutorily required inquiry and notice procedures." (*A.R., supra,* 77 Cal.App.5th at p. 204.) A tribe's rights under ICWA, and similarly under related state law, are "meaningless if the tribe has no notice that the action is pending." (*In re Junious M.* (1983) 144 Cal.App.3d 786, 790-791.) "Thus, the law allows a parent to raise failure to comply with ICWA on appeal, even if the issue was not raised in the trial court, because '[t]he parent is in effect acting as a surrogate for the tribe in raising compliance issues on appeal.'" (*A.R.*, at p. 204.)

"If ICWA is not complied with, '"the dependency proceedings, including an adoption following termination of parental rights, [are] vulnerable to collateral attack if the dependent child is, in fact, an Indian child."'" (*A.R., supra*, 77 Cal.App.5th at pp. 204-205.) That attack may be launched from several quarters under state law: "Any Indian child, the Indian child's tribe, or the parent or Indian custodian from whose custody the child has been removed, may petition the court to invalidate an action in an Indian child custody proceeding for foster care or guardianship placement or termination of parental rights if the action violated Section 1911, 1912, or 1913 of the federal Indian Child Welfare Act of 1978." (§ 224, subd. (e).)

A family member's belief that a child may have Indian ancestry or heritage must be investigated. The duty to inquire "obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290; § 224.2, subds. (a)-(c).) The agency's duty to inquire expressly includes asking "extended family members" whether they know or have reason to know that the child is an Indian child. (§ 224.2, subd. (b).)

11

Father contends, and we agree, that SSA did not meet this duty of inquiry as to the paternal grandmother in particular.[4] The record before us does not demonstrate SSA attempted to contact the paternal grandmother after Father told the court (and the agency) of the "word-of-mouth understanding in the maternal side of [his] family" that he had Cherokee heritage.

SSA must ask a range of people, including extended family members, about a child's lineage because "[i]t isn't easy to track tribal affiliations and those connections are easily lost. 'Oral transmissions of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's or other relative's identification of the family's tribal affiliation is not accurate. Accordingly, just as proper notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it.'" (*In re S.R.* (2021) 64 Cal.App.5th 303, 314.)

SSA contends it had no duty to attempt to contact the paternal grandmother because "Father provided no means or guidance by which to do so." We disagree.

SSA relies on cases in which the reviewing court held "social workers are not required '"to cast about"' for investigative leads to satisfy their duties of inquiry." (*In re Allison B.* (2022) 79 Cal.App.5th 214, 220, quoting *In re A.M.* (2020) 47 Cal.App.5th 303, 323; see also *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1084.) In these cases, however, a parent made only vague references to "unidentified 'cousins,'" deceased grandparents who had been the parent's only known relatives, or relations

---

[4] Mother again joins in Father's arguments, including Father's contention that while Mother and two members of her extended family denied any Indian background, SSA and the court failed to make any ICWA inquiry of several of Mother's known relatives. As we note below, SSA contends it rectified the omission during the pendency of the appeal, but since remand is required, the juvenile court should evaluate in the first instance the adequacy of these additional efforts.

somewhere "'in Louisiana.'" (*Allison B.*, at p. 219; *A.M.*, at p. 323; *Q.M.*, at pp. 1083-1084.)

Here, Father identified his mother as a source of information about his Indian heritage and told the court (and the agency) he had successfully contacted her through the social media platform, LinkedIn. Father's contact with his mother apparently resulted in further estrangement between the two. But these circumstances only reinforce the wisdom of the statutory requirement that the inquiry duty rests with the agency and the court, not the parent. (§ 224.2, subds. (a), (b).)

Parents or other relatives may have a less than favorable relationship with each other, or may be less interested in or committed to federal and state policies of protecting the continued existence and integrity of tribes—even perhaps viewing potential tribal involvement consciously or unconsciously as a source of competition for custody. (See § 366.26, subd. (b)(1).) But "the right at issue in the ICWA context is as much an *Indian tribe's* right to 'a determination' of a child's Indian status as it is a right of any sort of favorable outcome for the litigants already in a dependency case." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743.) ICWA and related state law therefore """"recognize[] that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents"""" and other relatives. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9.) That interest is compromised when the social service agency and the juvenile court fail to perform their inquiry duties.

"[T]he juvenile court 'has a responsibility to ascertain that [the child protective agency] has conducted an adequate investigation'" (*In re D.F.* (2020) 55 Cal.App.5th 558, 568), and must determine whether ICWA applies to the child's proceedings (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552). The court may conclude ICWA does not apply to the proceedings if it finds the child protective agency has satisfied its duty of inquiry and due diligence as required in section 224.2, and there is no reason to know the child is an Indian child. (§ 224.2, subd. (i)(2).)

13

Here, we conclude SSA did not conduct an adequate inquiry regarding the paternal grandmother for three reasons. First, the juvenile court specifically "direct[ed]" the agency at the detention hearing "to follow up to see if there is a possibility of reaching [Father's mother] . . . ." Second, Father told the court (and the agency) specifically the means by which he had reached his mother: via LinkedIn. Third, the agency (and the court) knew from the colloquy at the detention hearing that Father was now estranged from his mother.

The estrangement was such that Father apparently did not want his mother in his life. The natural inference is that he would not want her in his child's life either, including as the sole surviving conduit to the family's reputed Native American background on his mother's side. Under these circumstances, SSA should not have simply relied on its jurisdiction and disposition report in which it concluded Father "was unable to provide contact information for the paternal grandmother."

SSA's report did not describe any search efforts on the social media platform that Father used to contact his mother. SSA likewise did not enlist the court's aid to obtain any additional information from Father if needed; the court also failed to follow up on its contact order to confirm it was enforced. We therefore remand the case for SSA and the court to fulfill these inquiry duties.

By statute, the substantial evidence standard governs whether reversal is required. (§ 224.2, subd. (i)(2).) "The California Constitution prohibits a court from setting aside a judgment unless the error has resulted in a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*In re Celine R.* (2003) 31 Cal.4th 45, 59-60.) The Supreme Court "ha[s] interpreted that language as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error" and "the same test [applies] in dependency matters." (*Id.* at p. 60.)

14

In *A.R.*, no inquiry whatsoever was made into whether ICWA applied; it was "undisputed that at no point during the proceedings did either SSA or the court conduct any inquiry into whether the children had Native American heritage." (*A.R.*, *supra*, 77 Cal.App.5th at p. 203.) When there has been no investigation, it cannot be said "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

Similarly here, when a parent discloses to the court and the agency that there may be Indian heritage in the family, and that the parent has been in contact with the one person who could shed light on the matter, and the court and the agency do not make a reasonable effort to contact that person by the same means the parent did, it cannot be said there remains "no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

When "ICWA requirements have been ignored" (*A.R.*, *supra*, 77 Cal.App.5th at p. 207), either outright and entirely as in *A.R.*, or effectively here as to the family member most likely able to provide relevant information, "the failure to conduct the inquiry in each case constitutes a miscarriage of justice" (*id.* at p. 202). Thus, we adhere to "a clear rule that requires reversal in all cases where the ICWA inquiry rules were not followed." (*In re E.V.* (2022) 80 Cal.App.5th 691, 694 (*E.V*).)

On appeal, SSA filed a motion asking this court to take additional evidence regarding its outreach to Father's and Mother's extended family members, allegedly demonstrating that any error regarding its earlier ICWA inquiry duties has been rendered harmless. While Code of Civil Procedure section 909 permits appellate courts to take postjudgment evidence for the purpose of making independent factual determinations or "for any other purpose in the interests of justice," this authority must be used "'sparingly.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)

We deny respondent's motion as the proposed evidence says nothing about any effort by SSA to contact the paternal grandmother by the means known to have been successful in the past. Because remand is necessary, the juvenile court should evaluate

the ICWA evidence regarding Mother's extended family members "in the first instance." (*E.V.*, *supra*, 80 Cal.App.5th at pp. 700-701.)

## DISPOSITION

The order is conditionally reversed, and the case is remanded with instructions—to both SSA and the juvenile court—to fulfill their ICWA inquiry duty as to the paternal grandmother as soon as possible. If that inquiry reveals evidence of Native American heritage, then ICWA's corresponding notice requirements must be complied with. If it does not, and if the court finds SSA has complied with its inquiry duties regarding Mother's extended family, the order shall be reinstated forthwith.

GOETHALS, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16